IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ANITA JANINE ALLEN,                                    Case No. 3:16-cv-02067-SB

      Plaintiff,                                        **OPINION AND ORDER**

      v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

      Defendant.

_____

**BECKERMAN, Magistrate Judge.**

      Anita Janine Allen ("Allen") brings this appeal challenging the Commissioner of the

Social Security Administration's ("Commissioner" or "SSA") denial of her application for

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§

401-34. The Court has jurisdiction to hear this appeal pursuant to 42 U.S.C. § 405(g). For the

reasons that follow, the Court reverses the Commissioner's decision and remands for an award of

benefits.

## BACKGROUND

      Allen was born in September 1970, making her thirty-six years old on April 1, 2007, the

alleged disability onset date. She completed two years of college coursework, and her past

relevant work includes time as a waitress and supervisor at Shari's Restaurant. Allen alleges disability due to Ehlers-Danlos Syndrome, a "rare genetic condition typified by joint instability and chronic musculoskeletal pain," *Wong v. Minn. Dep't of Human Servs.*, 820 F.3d 922, 926 (8th Cir. 2016); Gastroesophageal Reflux Disease ("GERD"); Chronic Fatigue Syndrome ("CFS"); dysautonomia, a "malfunction of the autonomic nervous system," *Hill v. Astrue*, No. 11-00582, 2012 WL 4090171, at *2 n.8 (E.D. Cal. Sept. 17, 2012); Postural Orthostatic Tachycardia Syndrome ("POTS"), a syndrome "in which the patient's heart rate increases significantly upon standing without a significant drop in blood pressure," *Hibbard v. Sec'y of Health & Human Servs.*, 698 F.3d 1355, 1359 (Fed. Cir. 2012); and atypical chest pain. (Tr. 70, 83, 210.)

On July 16, 2007, Allen visited Dr. Sig-Linda Jacobson ("Dr. Jacobson"), an obstetrician, who noted that women with Ehlers-Danlos Syndrome "are at risk of preterm labor," that Allen "has had [four] term deliveries," which meant the risk of preterm labor was "very low" and her Ehlers-Danlos Syndrome "should not cause any major problems," and that Allen underwent three Von Willebrand's disease panels, two of which were within normal limits and one that was normal "with the exception of . . . the Von Willebrand factor activity [being] slightly low."[1] (Tr. 333; *see also* Tr. 343, confirming that Allen's more recent lab results were "consistent with her having type 1 Von Willebrand's [disease] that has been corrected during the pregnancy as expected").

On April 12, 2008, an x-ray of Allen's left foot showed "[n]o fracture or dislocation." (Tr. 347.)

---

[1] "Von Willebrand's disease is a hereditary bleeding disorder that adversely affects clotting." *Hawke-Dingman v. Comm'r of Soc. Sec.*, No. 11-15493, 2012 WL 5328674, at *2 (E.D. Mich. Sept. 11, 2012).

On July 1, 2008, Allen underwent an x-ray of her left wrist because she had fallen, and the x-ray was negative for a wrist fracture and "[n]o bony abnormalities [were] identified." (Tr. 408.)

On April 12, 2009, a magnetic resonance imaging ("MRI") of Allen's lumbar spine revealed "[m]inimal disk bulges" that were "not likely to account for [Allen's] current symptoms" of "stabbing and aching pain in [the] center of [her] low back, radiating into [the left] buttocks," "aching and numbness in [the left] thigh," and "numbness/tingling on [the] sole and tingling on [the] dorsum of [the left] foot," which was causing Allen to "drag[] her left leg." (Tr. 351, 409.) An x-ray of Allen's lumbar spine also revealed "no evidence of fractures," "normal" alignment in the vertebral bodies, "normal" intervertebral disc spaces, and "normal" facet joints. (Tr. 408.)

On April 21, 2010, Allen appeared for a genetics consultation with Dr. Dana Kostiner ("Dr. Kostiner"). In her treatment notes, Dr. Kostiner observed that Allen has "a personal history of multiple joint dislocations and subluxations," and concluded that Allen's "features do fit pretty well with the diagnosis" of the hypermobility subtype of Ehlers-Danlos Syndrome. (Tr. 373; *see also* Tr. 375, noting that all of Allen's "children have been diagnosed with EDS hypermobility type, and Allen's "physical exam and history [are] consistent" with such a diagnosis).

On August 10, 2010, Allen appeared for a neurological consultation with Dr. Ruxandra Costa-Corpaciu ("Dr. Costa-Corpaciu"). Allen complained of "tension-like headache[s] with some dizziness" and a ten-year "history of low back pain and mainly left leg weakness," described "some numbness and tingling over the left lateral aspect of [her] thigh off and on," noted that "at the end of the day she has more problems ambulating with her left leg," and

reported that she has "a history of dislocating" her left hip and "right arm, especially when vacuuming," and difficulty "picking up her leg" in order to use the stairs. (Tr. 382-83.) Dr. Costa-Corpaciu indicated that she "doubt[ed]" that Allen was experiencing "any possible radiculopathy or neuropathy" based on "her physical examination," and stated that "[u]nfortunately, for [patients with] Ehlers-Danlos [Syndrome] there is no specific treatment." (Tr. 383-84.)

On August 26, 2010, Allen underwent an electromyogram ("EMG") which revealed "[n]o electrical evidence to support a radiculopathy, plexopathy, or peripheral neuropathy." (Tr. 389.)

On November 1, 2011, Allen appeared for a pain management consultation with Dr. Kimberly Mauer ("Dr. Mauer"). Allen complained of pain in her low back, hip, and legs. (Tr. 492-494.) An MRI of Allen's lumbar spine revealed "some minimal arthritis at L5-S1," and Dr. Mauer "guess[ed] that this is what is contributing to the pain [that Allen] is experiencing." (Tr. 495-97.) Dr. Mauer added that Allen suffers from Ehlers-Danlos Syndrome, and "understands that her joint mobility and laxity could definitely be contributing to her overall pain syndrome." (Tr. 497.)

In a treatment note dated November 29, 2011, Dr. Mauer stated that Allen "suffers from low back pain primarily on the left in the lower outer quadrant of the left buttocks region," Allen's "imaging is significant for some mild L5-S1 facet arthropathy bilaterally and some femoral acetabular impingement . . . bilaterally," Allen "suffers from Ehlers-Danlos Syndrome, which could also be contributing to laxity of multiple ligamentous areas in the lumbar spine," and the primary "hindrance to [Allen's] treatment is that she is very limited financially as well as time." (Tr. 467.)

On December 18, 2012, Dr. Joshua Boyd ("Dr. Boyd"), a non-examining state agency psychologist, completed a psychiatric review technique assessment. (Tr. 76.) Based on his review of the record, Dr. Boyd concluded that the limitations imposed by Allen's mental impairments failed to satisfy listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders).

On December 10, 2012, Dr. Mollie Thompson ("Dr. Thompson"), a rheumatologist, ordered images of Allen's pelvis and sacroiliac joints based on complaints of back and hip pain. Dr. Thompson concluded that the images were "[n]ormal," with "no bony abnormalities," joint spaces that were "maintained," "minimal [signs] of any sclerosis or osteophytosis at the hip joints," and sacroiliac joints there were "normal without erosions, pseudowidening, or sclerosis." (Tr. 565.)

On December 19, 2012, Dr. Martin Kehrli ("Dr. Kehrli"), a non-examining state agency physician, completed a physical residual functional capacity assessment. (Tr. 77-79.) Dr. Kehrli concluded that Allen can lift and carry twenty pounds occasionally and ten pounds frequently; stand, sit, or walk up to six hours during an eight-hour workday; push or pull in accordance with her lifting and carrying restrictions; frequently stoop, kneel, crouch, crawl, and climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; and balance without limitation. Dr. Kehrli also concluded that Allen does not suffer from any manipulative, visual, or communicative limitations, but she does need to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.

On April 2, 2013, Dr. Emilia Arden ("Dr. Arden"), a cardiologist, administered a tilt table test, and diagnosed Allen with "[a]utonomic dysfunction with [POTS] and neurocardiogenic syncope." (Tr. 576.)

On June 7, 2013, Dr. Kordell Kennemer ("Dr. Kennemer"), a non-examining state agency psychologist, completed a psychiatric review technique assessment, agreeing with Dr. Boyd's finding that Allen's mental impairments fail to satisfy listings 12.04 and 12.06. (Tr. 90-91.)

On June 10, 2013, Dr. Linda Jensen ("Dr. Jensen"), a non-examining state agency physician, issued a physical residual functional capacity assessment, wherein she agreed with Dr. Kehrli's conclusion that Allen can lift and carry twenty pounds occasionally and ten pounds frequently; stand, sit, or walk up to six hours during an eight-hour workday; push or pull in accordance with her lifting and carrying restrictions; frequently kneel, crawl, and climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; and balance without limitation. (Tr. 92-94.) Dr. Jensen also agreed with Dr. Kehrli's finding that Allen does not suffer from any manipulative, visual, or communicative limitations, but she does need to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. Unlike Dr. Kehrli, however, Dr. Jensen found that Allen could only stoop or crouch on an occasional, as opposed to frequent, basis.

On August 26, 2013, Allen was seen by Dr. Osvaldo Schirripa ("Dr. Schirripa") at the Central Oregon Clinical Genetics Center. Based on a clinical interview, review of Allen's past imaging and test results, and administration of tests used to assess joint laxity and hypermobility, Dr. Schirripa's findings "confirm[ed] the diagnosis" of "Ehlers-Danlos syndrome, hypermobility type." (Tr. 699.) Dr. Schirripa also "recommend[ed] genetic testing of [Allen's] whole exome sequence," given her "complex multi-system medical conditions and extensive evaluations by numerous medical specialists without resolution as to the cause of some of her problems." (Tr. 699.)

On September 12, 2014, Allen underwent an MRI that showed "no cervical spine abnormality." (Tr. 613.)

On October 8, 2014, Dr. Swati Kakodkar ("Dr. Kakodkar"), who had treated Allen for approximately two years, filled out a questionnaire at the request of Allen's counsel. In that questionnaire, Dr. Kakodkar stated that Allen suffers from Ehlers-Danlos Syndrome, Von Willebrand's disease, "[f]oot drop and chronic knee issues," "[m]ast cell disorders leading to chronic allegories," and "[d]ysautonomia/POTS," and as a result of those medical conditions, it is "medically probable" that Allen would "miss [two] or more days from work per month on an unpredictable basis," "be limited to lifting and carrying [ten] pounds or less," "be required to take breaks and rest at unpredictable times during an average working day," and be "unable to work." (Tr. 589-90; *see also* Tr. 578, establishing care on October 19, 2012). Dr. Kakodkar added that Allen's conditions "make[] it very difficult for her to work/engage in any activity." (Tr. 590.)

Allen's cardiologist, Dr. Arden, rheumatologist, Dr. Howard Gandler ("Dr. Gandler"), and allergist and immunologist, Dr. Kursteen Salter-Price ("Dr. Salter-Price"), also filled out questionnaires in October 2014, and opined that, as a result of Allen's conditions, it is "medically probable" that she would "miss [two] or more days from work per month on an unpredictable basis," "be limited to lifting and carrying [ten] pounds or less," "be required to take breaks and rest at unpredictable times during an average working day," and be "unable to work." (Tr. 591-94, 597-98.)

On March 19, 2015, Allen appeared and testified at a hearing before an Administrative Law Judge ("ALJ"). (Tr. 34-68.) Allen testified that she lives with her husband, mother, and five kids, she worked as a waitress and supervisor at Shari's Restaurant until 2007, and she stopped

working because she could not "get the [reduced] hours that [she] needed for [her] health," she "had multiple falls and injuries," and she would at times need to "retreat to the office" due to the smell of cologne or perfume in the restaurant. (Tr. 35-37, 61.) Allen also testified that one of her children was home schooled from 2012 through 2015, and Allen or her mother would serve as "the learning coach," which entailed "lay[ing] out what . . . needed to [be done] each day," "answer[ing] questions," and making sure that Allen's daughter "logged onto the computer on time," "had somebody to read to," and "scanned in documents that she had worked on." (Tr. 42-43, 50.) Allen added that her mother moved into the family residence shortly before Christmas 2012 and in the "same month" they "started the home school program," because Allen had difficulty sleeping and "often slept during the day," "could no longer even get the other kids up for school and out the door and start her [daughter's] school day at home," could not "get downstairs" at times, had difficulty bathing, could not "attend school functions anymore" or "church full-time," and stopped "doing [her] own chores," with the exception of folding laundry on her bed, shopping with an assistant to "help carry everything," and preparing simple meals. (Tr. 42-59.)

The ALJ posed hypothetical questions to a Vocational Expert ("VE") who testified at Allen's hearing. First, the ALJ asked the VE to assume that a hypothetical worker of Allen's age, education, and work experience could perform sedentary work that (1) involves frequent handling bilaterally and occasional stooping, balancing, kneeling, crouching, crawling, and climbing of ramps and stairs, and (2) does not involve climbing ladders, ropes, or scaffolds, or concentrated exposure to pulmonary irritants and workplace hazards. (Tr. 64.) The VE testified that the hypothetical worker could not perform Allen's past relevant work as a waitress/server and waitress/supervisor, but she could be employed in "assembly jobs" and "packaging and

handling jobs." (Tr. 65.) Responding to the ALJ's remaining hypothetical questions, the VE testified that the hypothetical worker could still perform the jobs described above if she needed to be allowed "to decide which portion of the day [she would] be sitting and which portion [she would] be standing," but the hypothetical worker could not sustain competitive employment if she was "absent from work two to three times per month on an ongoing basis" due to her impairments, or would need to take three "extra breaks during the workday" that "would last for [fifteen] minutes each" and "would be in addition to standard breaks offered to all employees." (Tr. 65-66.)

In a written decision issued on April 9, 2015, the ALJ applied the five-step evaluation process set forth in 20 C.F.R. § 404.1520(a)(4), and determined that Allen was not disabled. *See infra*. The Social Security Administration Appeals Council denied Allen's petition for review, making the ALJ's decision the Commissioner's final decision. Allen timely appealed to federal district court.

## THE FIVE-STEP SEQUENTIAL ANALYSIS

### I.    LEGAL STANDARD

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are as follows:

> (1) Is the claimant presently working in a substantially gainful activity? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal [one of the listed impairments]? (4) Is

the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Id.* at 724-25. The claimant bears the burden of proof for the first four steps in the process. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of the first four steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

## II.    THE ALJ'S DECISION

The ALJ applied the five-step sequential evaluation process to determine if Thom is disabled. 20 C.F.R. § 404.1520(a)(4). (Tr. 10-26.) At step one, the ALJ determined that Allen had not engaged in substantial gainful activity between April 1, 2007, the alleged disability onset date, and December 31, 2012, the date last insured.[2] At step two, the ALJ determined that Allen had the following severe impairments: GERD, dysautonomia with POTS, Ehlers-Danlos

---

[2] "To be eligible for disability insurance benefits under Title II, a worker must have earned a sufficient number of [quarters of coverage] within a rolling forty quarter period." *Herbert v. Astrue*, No. 07–01016, 2008 WL 4490024, at *4 n.3 (E.D. Cal. Sept. 30, 2008). Quarters of coverage are accumulated based upon a worker's earnings. *Id.* Typically, "the claimant must have a minimum of twenty quarters of coverage [during the rolling forty quarter period to maintain insured status]. . . . The termination of a claimant's insured status is frequently referred to as the 'date last insured' or 'DLI.'" *Id.* (citations omitted). Thus, Allen's date last insured of December 31, 2012, reflects the date on which her insured status terminated based on the prior accumulation of quarters of coverage.

Syndrome, "fasciitis of the left foot with associated heel spur syndrome, infracalaneal bursitis (heel inflammation) and gastrocnemius (calf muscle) equinus contracture (limited upward bending motion of ankle joint), obesity, asthma, and fibromyalgia." (Tr. 12.) At step three, the ALJ found that Allen did not have an impairment that meets or equals a listed impairment. The ALJ then concluded that Allen had the residual functional capacity ("RFC") to do "sedentary work" that (1) allows the employee "to change position from sit to stand or stand to sit at will," (2) involves frequent handling and occasional stooping, balancing, kneeling, crouching, crawling, and climbing of ramps and stairs, and (3) does not involve climbing ladders, ropes, and scaffolds, or concentrated exposure to pulmonary irritants and workplace hazards. (Tr. 16.) At step four, the ALJ found that Allen could not perform her past relevant work. At step five, the ALJ determined that Allen is not disabled because she can perform other jobs that exist in significant numbers in the national economy, including work as a packager/handler and assembler.

## STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire

record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* If the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the judgment of the ALJ. *Bray,* 554 F.3d at 1222 (citing *Massachi v. Astrue,* 486 F.3d 1149, 1152 (9th Cir. 2007)).

## DISCUSSION

In this appeal, Allen argues that the ALJ erred by: (1) failing to provide clear and convincing reasons for discounting Allen's testimony; (2) failing to provide legally sufficient reasons for discounting the opinions of Allen's treating doctors, Drs. Arden, Gandler, Kakodkar, and Salter-Price; and (3) failing to provide germane reasons for discounting the lay witness testimony provided by Allen's husband, son, daughter, mother, and friend. As explained below, the Court finds that the Commissioner's decision is not supported by substantial evidence and is based on legal error, that Allen satisfies all three conditions of the credit-as-true rule, and that a careful review of the record discloses no reason seriously to doubt that Allen is, in fact, disabled. Accordingly, the Court reverses the Commissioner's decision and remands for an award of benefits.

## I. CREDIBILITY DETERMINATION

### A. Applicable Law

Absent an express finding of malingering, an ALJ must provide clear and convincing reasons for rejecting a claimant's testimony:

> Without affirmative evidence showing that the claimant is malingering, the [ALJ]'s reasons for rejecting the claimant's testimony must be clear and convincing. If an ALJ finds that a claimant's testimony relating to the intensity of his pain and other limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive. The ALJ must specifically identify what testimony is

> credible and what testimony undermines the claimant's
> [subjective] complaints.

*Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 597 (9th Cir. 1999) (citations omitted).

Clear and convincing reasons for rejecting a claimant's subjective symptom testimony "include

conflicting medical evidence, effective medical treatment, medical noncompliance,

inconsistencies in the claimant's testimony or between her testimony and her conduct, daily

activities inconsistent with the alleged symptoms, and testimony from physicians and third

parties about the nature, severity and effect of the symptoms complained of." *Bowers v. Astrue*,

No. 6:11-cv-583-SI, 2012 WL 2401642, at *9 (D. Or. June 25, 2012); *see also Molina v. Astrue*,

674 F.3d 1104, 1112 (9th Cir. 2012) ("[T]he ALJ is not 'required to believe every allegation of

disabling pain, or else disability benefits would be available for the asking, a result plainly

contrary to 42 U.S.C. § 423(d)(5)(A).'" (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.

1989))).

### B.      Application of Law to Fact

There is no affirmative evidence that Allen is malingering and, therefore, the ALJ was

required to provide clear and convincing reasons for discrediting Allen's symptom testimony.

Upon review, the Court finds that the ALJ failed to satisfy the clear and convincing reasons

standard. *See generally Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)

("The clear and convincing standard is the most demanding required in Social Security cases. It

is the same as that required to reject the uncontradicted opinion of a treating physician") (citation

omitted).

As an initial matter, the Commissioner asserts that the ALJ applied "ordinary techniques

of credibility evaluation" to reject Allen's testimony. In support for her argument, the

Commissioner cites the following example: "[T]he ALJ found that Plaintiff's claim that she

stopped working due to her impairments was inconsistent with her March 2009 report to her care provider that she had 'quit her job' about two years earlier." (Def.'s Opp'n Br. at 16) (citations omitted). In *Trevizo v. Berryhill*, 871 F.3d 664 (9th Cir. 2017), the ALJ discounted a claimant's testimony on the ground that she provided "'inconsistent statements about why she stopped working,'" and in doing so, the ALJ noted that the claimant "alleged that she had 'stopped working as a security guard due to flares with psoriasis' but had also 'reported to [a doctor] that she quit the job,' asserting that those statements were contradictory." *Id*. at 681. The Ninth Circuit held that there was "no inconsistency between the two assertions" and thus it failed to qualify as a clear and convincing reason for discounting the claimant's testimony. *Id*. Consistent with *Trevizo*, this Court finds that there is no inconsistency between Allen's assertion (1) that she quit her job and (2) that she stopped working due to her impairments. Indeed, Allen never alleged that she was terminated or that her departure was unrelated to her ability to meet the demands of the job. (*See* Tr. 294, reporting that Allen "quit work [three] years ago," but adding that her "thoughts [are] never far from pain" and she "can't image ever being able to work again"). Accordingly, the Court finds that the ALJ erred in discounting Allen's testimony on this ground.

The ALJ also discounted Allen's symptom testimony because her "use of medications prior to her [date last insured] did not suggest the presence of an impairment that was more limiting than found in [the ALJ's] decision." (Tr. 24.) As support for this assertion, the ALJ emphasized that "the medical records reveal that the medications [used prior to the date last insured] were relatively effective in controlling [Allen's] symptoms." (Tr. 24.) The fact that a claimant's impairments can be controlled effectively with medication is a clear and convincing reason for discounting the claimant's testimony. *See Ash v. Berryhill*, 676 F. App'x 632, 632-33

(9th Cir. 2017) (affirming credibility determination under the clear and convincing reasons standard, and noting that the ALJ supported his credibility determination by referring to "evidence that [the claimant's] medications had been 'relatively effective' in controlling her symptoms"). Here, however, substantial evidence does not support discounting Allen's testimony on this ground.

The record suggests that Allen alleges disability due primarily to Ehlers-Danlos Syndrome, a "rare genetic condition typified by joint instability and chronic musculoskeletal pain." *Wong*, 820 F.3d at 926. (*See* Tr. 38-39, indicating that Allen wished to apply for Social Security benefits in 2009 or 2010 as the result of Ehlers-Danlos Syndrome, Tr. 295, describing Allen's medical problems, referring to Allen's Ehlers-Danlos Syndrome as "1-Highest" priority in October 2012, and noting that the condition had been treated since October 2003, Tr. 210, listing "[j]oint hypermobility syndrome" first on Allen's list of allegedly disabling conditions, Tr. 218, 240, alleging that Allen's ability to work is limited primarily by chronic pain, Tr. 283-84, describing Ehlers-Danlos Syndrome as Allen's primary barrier to maintaining employment). Substantial evidence supports the conclusion that Allen suffers from Ehlers-Danlos Syndrome. (*See* Tr. 12-13, concluding that Allen's "Ehlers-Danlos/joint hypermobility syndrome" was a severe impairment, Tr. 373-375, concluding that Allen's "features do fit pretty well with the diagnosis" of Ehlers-Danlos Syndrome, and observing that Allen's "physical exam and history [are] consistent" with such a diagnosis, Tr. 606, observing that Allen "clearly has an inheritable connective tissue disorder characterized by dislocating joints, aortic dilation and some hypermobility," Tr. 699, "confirm[ing] the diagnosis" of "Ehlers-Danlos syndrome, hypermobility type"). Substantial evidence does not, however, support the conclusion that medications have been effective in controlling Allen's symptoms. (*See* Tr. 383-84, stating that

"[u]nfortunately, for Ehlers-Danlos [Syndrome] there is no specific treatment," Tr. 493, noting in

November 2011 that Ultram was "not really effective," Vicodin caused an "anaphylactic

reaction," acetaminophen and ibuprofen cause Allen "to be very sleepy," Lidoderm patches are

"not effective," and in terms of effective treatments, Allen reported that "[n]othing really" helps,

Tr. 497-504, stating that Allen complained of insomnia "[d]ue to pain" in November 2011,

Allen's pain had remained "unchanged" despite using "lidocaine patches, tramadol, ibuprofen

and tylenol for pain," and Allen "underst[ood] that her joint mobility and laxity could definitely

be contributing to her overall pain syndrome," Tr. 566-68, complaining of "ongoing issues of

pain" and "joint pain" in December 2012, despite receiving cortisone shots and using bracing

and a nerve stimulator, indicating that Allen "cannot tolerate most pain medications including

nonsteroidal anti-inflammatory medications and most narcotics," stating that Allen suffers from a

"history of diffuse pain, known Ehlers-Danlos type 3 with hypermobility," and noting that "there

[are] no specific interventions" for Ehlers-Danlos Syndrome, "other than joint protection and

strengthening").

Accordingly, the ALJ erred in discounting Allen's testimony on the ground that her

medications "were relatively effective in controlling [her] symptoms." *See Stansfield v. Colvin*,

No. 12-cv-10090, 2013 WL 6482780, at *6 (C.D. Cal. Dec. 10, 2013) ("[T]he ALJ's finding that

plaintiff's pain was adequately controlled with medication is not supported by substantial

evidence and, thus, is not a clear and convincing reason for rejecting her subjective pain

allegations."); *Garcia v. Astrue*, No. 12-cv-00992, 2013 WL 1797029, at *14 (S.D. Cal. Mar. 13,

2013) ("[W]hile there is evidence supporting a statement that medication temporarily helped

[one of the impairments that the ALJ determined was severe], there is not substantial evidence

supporting the ALJ's [ultimate] conclusion that [the claimant's] medication controlled her symptoms").

The ALJ also discounted Allen's testimony based on its inconsistency with her reported activities. In support of this assertion, the ALJ noted that Allen "has been raising five children, who she described as 'chronically ill,'" that Allen's "two youngest stayed home with her and she homeschooled one of them," and that Allen "performed personal care activities independently, shopped in stores, prepared meals, did laundry, drove a car, and cleaned her home." (Tr. 23.) Allen, however, testified that (1) she "often slept during the day," "rest[s] all day some days after shopping," "often [has] to stop and come back later" to finish tasks, needs to rest after twenty to thirty minutes of walking or standing due to pain, and "need[s] to rest several hours" if she "clean[s] for [thirty] minutes," (2) her mother moved into the family residence the "same month" the Allens "started the home school program" (and prior to Allen's date last insured) due to her level of impairment, (3) her mother "helps with anything [she] gets too tired or [has] too much pain to do," such as driving, homeschool and childcare activities, and preparing meals, (4) most of Allen's participation in her daughter's "homeschooling happened from bed," and Allen still "wouldn't be able to always work with her every day," and (5) her husband "cleans [the] house," but Allen does "sweep the kitchen, wash dishes," load the washer, shop with assistance, "water [the] yard," "blow leaves once a year," and prepare "easy meals." (Tr. 42-59, 240-47; *see also* Tr. 283, testifying that Allen used to shop, clean the house, teach her children, manage medical and school appointments, "[c]lean sheets every week," and "[c]lean bathrooms every week," but now is "lucky to be able to get to some of these basic chores once per month").

Based on the foregoing, the Court concludes that the ALJ mischaracterized Allen's testimony regarding her ability to care for her children and perform other activities of daily

living, and therefore erred in discounting her testimony on that ground. *Cf. Garrison*, 759 F.3d at 1015-16 (noting that the ALJ discredited the claimant's testimony based on its "supposed inconsistency with her reported daily activities," which included "talking on the phone, preparing meals, cleaning her room, and helping to care for her daughter," holding that the ALJ committed reversible error by mischaracterizing the claimant's testimony, and noting that the claimant had actually "emphasized that in performing many daily tasks, including caring for her daughter, she was heavily assisted by her mother," "made clear that she is regularly prohibited by her pain from engaging in activities such as doing laundry, picking up her daughter, and carrying bags that weigh more than a few pounds," and "testified that after performing such activities, she often must rest, leading her to nap several hours per day"); *see also id.* at 1016 ("We have repeatedly warned that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day.") (citation omitted).

Furthermore, the ALJ discounted Allen's testimony on the ground that "[h]er testimony at the hearing contradicted the descriptions of her symptoms that she told to her medical providers at the time of her doctor visits." (Tr. 23.) In support of this assertion, the ALJ noted that Allen testified that "she required significant help from her husband and mother in raising her children," "she was essentially bedbound," and "her mother had moved into the home to care for the kids and do the homeschooling," yet Allen's treatment records from 2011 and 2012 "do not mention her spending all day in bed and they do not mention any inability to do daily activities." (Tr. 23.) However, substantial evidence does not support the ALJ's finding that Allen provided contradictory testimony. (*Compare* Tr. 42-54, indicating that Allen testified that she receives

significant assistance from her mother and husband, most of her participation in the "homeschooling [that began in late 2012] happened from bed," she "often slept during the day," and she "sit[s] on the bed [to fold] laundry," *with* Tr. 337, reporting that Allen was "having trouble" with activities of daily living, Tr. 349, noting that Allen has a history of Ehlers-Danlos Syndrome and "chronically dislocates her right wrist just by moving a vacuum in regular motion," Tr. 351, noting that Allen complained of pain and reported "dragging her left leg" and that she "stopped wearing socks because it is hard to put them on," Tr. 367, noting that Allen "wakes up and some days cannot use her legs," Tr. 377, noting that Allen's pain is "[b]etter with rest" and "[w]orse with standing," Tr. 382, reporting that Allen experiences difficulty using her leg and walking up or down stairs, Tr. 463, complaining of pain on November 29, 2011, rating the pain as a seven out of ten with respect to "[g]eneral activity," and reporting that the "pain is made worse by standing or sitting too long," Tr. 469, reporting on December 2, 2011, that Allen has a history of "right wrist dislocation" and she has "to brace it to be able to carry out her daily activities," Tr. 480, reporting on October 10, 2011, that Allen "often feels tired but cannot sleep" and the "constant care" Allen's "family needs is a definite drain on her both physically and emotionally," but she "has support systems in place to help when she really needs it," Tr. 493, noting on November 1, 2011, that Allen "has been diagnosed with Ehlers-Danlos Syndrome" and complained of "ongoing pain," that Allen's "pain is made worse by walking," and that Allen rated her pain as an eight and ten on a ten-point scale in terms of general activity and walking, respectively).

In sum, the Court finds that the ALJ erred because his credibility determination is not supported by substantial evidence.

///

## II.    MEDICAL OPINION EVIDENCE

### A.    Applicable Law

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). In the event "a treating or examining physician's opinion is contradicted by another doctor, the '[ALJ] must determine credibility and resolve the conflict.'" *Id.* (citation omitted). "An ALJ may only reject a treating physician's contradicted opinions by providing 'specific and legitimate reasons that are supported by substantial evidence.'" *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (quoting *Ryan v. Comm'r Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). Merely stating conclusions is insufficient: "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id.* at 1012-13 (citation omitted).

### B.    Application of Law to Fact

Allen argues that the ALJ erred by failing to provide legally sufficient reasons for discounting the opinions of her treating doctors, Drs. Arden, Gandler, Kakodkar, and Salter-

Price. The Court agrees that the ALJ committed harmful error in evaluating the medical opinion evidence.

Drs. Arden, Gandler, Kakodkar, and Salter-Price's opinions conflict with the assessments completed by the state agency medical consultants, none of whom opined that Allen is unable to sustain competitive employment as the result of her impairments. (*Compare* Tr. 80, 95, finding Allen "[n]ot [d]isabled" based on the "documented findings," *with* Tr. 590, 592, 594, 598, opining that Allen "is unable to work," meaning she is "unable to engage in substantial gainful activity"). Therefore, the ALJ needed to provide specific and legitimate reasons supported by substantial evidence in the record for discrediting Drs. Arden, Gandler, Kakodkar, and Salter-Price's opinions. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) ("[I]n the case of a conflict 'the ALJ must give specific, legitimate reasons for disregarding the opinion of the treating physician.'") (citation omitted); *Killan v. Barnhart*, 226 F. App'x 666, 668 (9th Cir. 2007) ("Killian's contention that the ALJ erred when he discounted her treating physician's opinion is flawed because the treating physician's opinion conflicted with that of a nonexamining physician, and the ALJ supported his decision with specific and legitimate reasons.").

### 1.    Dr. Kakodkar

Allen first argues that the ALJ failed to provide legally sufficient reasons for discounting Dr. Kakodkar's opinion. (Pl.'s Opening Br. at 10-11.) Dr. Kakodkar began treating Allen in October 2012. (*See* Tr. 578, establishing care in October 2012). Dr. Kakodkar filled out a yes-or-no, check-box questionnaire two years later, opining that it is "medically probable" that Allen would "miss [two] or more days from work per month on an unpredictable basis," "be limited to lifting and carrying [ten] pounds or less," "be required to take breaks and rest at unpredictable times during an average working day," and be "unable to work." (Tr. 589-90.) Dr. Kakodkar

added that Allen's conditions "make[] it very difficult for her to work/engage in any activity." (Tr. 590.)

The ALJ gave "partial weight" to Dr. Kakodkar's opinion "because, although the doctor provided some supporting explanation, the doctor did not attempt to isolate the claimant's condition as of the [date last insured]." (Tr. 21.) Consequently, the ALJ concluded that it was "unclear whether Dr. Kakodkar believes the claimant's inability to perform any work would be similarly limiting as of December 31, 2012, inasmuch as Dr. Kakodkar's single treatment record prior to the claimant's [date last insured] is fairly routine and notes mostly a normal exam." (Tr. 21.)

Allen argues that the ALJ committed reversible error and notes that the Ninth Circuit addressed a comparable situation in *Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996). In *Smolen*, a treating physician, Dr. Bert Hoeflich, provided an opinion in support of the claimant's application for benefits and did so by responding to "leading" questions that "called for yes-or-no answers" and "for comments from the physicians in support of their answers." *Id.* at 1285-88. The ALJ rejected Dr. Hoeflich's opinion based, in part, on the fact that he failed to provide comments to supports his answers. *Id.* at 1288. The ALJ therefore concluded that he "did not know the basis for Dr. Hoeflich's opinions and thought that they might have been based on unwarranted assumptions." *Id.* The Ninth Circuit held that the ALJ failed to provide legally sufficient reasons for rejecting Dr. Hoeflich's opinion evidence. *Id.* In so holding, the Ninth Circuit reiterated the ALJ's duty to develop the record:

> In Social Security cases the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered. This duty exists even when the claimant is represented by counsel. If the ALJ thought he needed to know the basis of Dr. Hoeflich's opinions [expressed in the check-box form] in order to evaluate them, he had a duty to conduct an appropriate

inquiry, for example, by subpoenaing the physicians or submitting further questions to them. He could also have continued the hearing to augment the record. Having failed to fully develop the record regarding the basis for Dr. Hoeflich's opinions, the ALJ could not then reject those opinions—which were uncontroverted and corroborated—because they were given in response to leading, hypothetical questions.

*Id.* (internal citations and quotation marks omitted).

The Commissioner does not address or attempt to distinguish *Smolen* in her response. Instead, the Commissioner relies on the district court's decision in *Robinson v. Colvin*, No. 3:13-cv-00332-AC, 2014 WL 3778572, at *5 (D. Or. July 29, 2014). In *Robinson*, the claimant argued that the ALJ erred in rejecting the opinion of her treating psychiatrist, who opined that the claimant was unable to work as of an unspecified date. *Id.* In upholding the ALJ's rejection of the psychiatrist's opinion, the *Robinson* court observed that it was "not clear" whether the psychiatrist's opinion addressed the claimant's ability to work prior to her date last insured (i.e., "during the relevant period"). *Id.* In light of this ambiguity "as to the exact onset disability date," the *Robinson* court found it was "reasonable for the ALJ to conclude that [the psychiatrist's] opinion did not reflect on the issue of [the claimant's] disability during the relevant period." *Id.* at *6. The *Robinson* court then stated: "Even assuming that [the psychiatrist's] opinion clearly stated that [the claimant] was disabled [during the relevant period], the ALJ provided legally sufficient reasons for rejecting it." *Id.* One of those reasons was the fact that the psychiatrist's opinion "was inconclusive as to [the claimant's] functional abilities during the relevant period." *Id.*

The Court is not persuaded by the Commissioner's reliance on *Robinson*. The ALJ's treatment of Dr. Kakodkar's opinion is more analogous to the situation presented in *Smolen*, which is binding precedent that this Court must follow. Indeed, in this case, as in *Smolen*, a treating doctor provided an opinion in support of a claimant's application for benefits, the

claimant "appropriate[ly]" used "leading, hypothetical questions to elicit expert opinions," *Smolen*, 80 F.3d at 1288, the doctor's opinion was corroborated by other medical providers, and the ALJ nevertheless discounted the doctor's opinion based, in part, on the fact that certain information was unknown (i.e., whether Dr. Kakodkar's opinion regarding Allen's ability to work applied to the period predating Allen's date last insured, and the basis for the psychiatrist's check-box responses in *Smolen*). Under these circumstances, *Smolen* makes clear that the ALJ had a duty further to develop the record by subpoenaing Dr. Kakodkar or submitting further questions to her. Accordingly, the ALJ erred in discounting Dr. Kakodkar's opinion evidence on this ground.

The only other reason the ALJ proffered to support rejecting Dr. Kakodkar's opinion evidence was the ALJ's assertion that "Dr. Kakodkar's single treatment record prior to the claimant's [date last insured was] fairly routine and notes mostly a normal exam." (Tr. 21.) This reason, standing alone, is not a sufficient basis to discount Dr. Kakodkar's opinion.[3] *See Winnett v. Astrue*, No. 08-5054, 2009 WL 2160691, at *8 (E.D. Wash. July 16, 2009) ("Lastly, even if it was proper for the ALJ to conclude Plaintiff's caregiving activities are inconsistent with Dr.

_____

[3] The Commissioner acknowledges that the ALJ only provided "two reasons" for discounting Dr. Kakodkar's opinion: (1) the fact that Dr. Kakodkar "did not clearly indicate that Plaintiff's inability to work preceded her date last insured," and (2) the fact that Dr. Kakodkar's opinion contradicted her "recording of mostly normal findings during the fairly routine examination" that preceded the date last insured. (Def.'s Opp'n Br. at 10.) Nevertheless, the Commissioner goes on to state: "The ALJ also noted that Plaintiff . . . told Dr. Kakodkar that she was homeschooling her children with attention deficit disorder. This is one of several activities that the ALJ expressly found to be inconsistent with Plaintiff's claims of total disability during the relevant time period." (Def.'s Opp'n Br. at 11, citing Tr. 20.) The ALJ did mention this fact, but he did not cite it as a ground for discounting Dr. Kakodkar's opinion. (*See* Tr. 20-21.) "Long-standing principles of administrative law require [the Court] to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not *post hac* rationalizations that attempt to intuit what the adjudicator may have been thinking." *Bray*, 554 F.3d at 1225. Even if that were not the case, however, the Court has already concluded that the ALJ mischaracterized Allen's testimony and thus erred in discounting Allen's symptom testimony based on her reported activities.

Smith's assessment, that reason alone is an insufficient basis to reject Dr. Smith's entire report. The ALJ is required to provide specific, legitimate reasons supported by substantial evidence in rejecting the opinion of an examining psychologist. In this case, the one reason cited by the ALJ does not constitute 'specific, legitimate reasons' supported by the evidence. Therefore, the ALJ erred in assigning little weight to Dr. Smith's opinion.") (citation omitted).

### 2. Dr. Arden

The ALJ's treatment of Dr. Arden's opinion also ran afoul of *Smolen*. (*See* Tr. 21, assigning Dr. Arden's corroborating opinion "limited weight," and stating "this is a 'checkbox form' that does not provide any supporting explanation for its conclusions"); *cf. Smolen*, 80 F.3d at 1288 ("Dr. Hoeflich, on the other hand, did not provide comments to support his answers [on the check-box form] and did not testify at the hearing. Therefore, the ALJ did not know the basis for Dr. Hoeflich's opinions and thought that they might have been based on unwarranted assumptions. . . . If the ALJ thought he needed to know the basis of Dr. Hoeflich's opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them."). Accordingly, the ALJ erred in discounting Dr. Arden's opinion evidence on this ground.

The only other reason the ALJ proffered to support the rejection of Dr. Arden's opinion was the ALJ's assertion that Dr. Arden's treatment records "show[ed] only routine care and recommendations" and, therefore, did "not support the alleged severity of the claimant's condition." (Tr. 21; *see also* Def.'s Opp'n Br. at 11-12, arguing that "[t]he ALJ reasonably discounted Dr. Arden's opinion for two reasons," and citing the fact that "Dr. Arden's checkbox opinion did not provide any supporting explanation for its conclusions" as one reason). This sole remaining reason does not constitute substantial evidence to support the rejection of Dr. Arden's opinion. *See Winnett*, 2009 WL 2160691, at *8 ("Lastly, even if it was proper for the ALJ to

conclude Plaintiff's caregiving activities are inconsistent with Dr. Smith's assessment, that reason alone is an insufficient basis to reject Dr. Smith's entire report. The ALJ is required to provide specific, legitimate reasons supported by substantial evidence in rejecting the opinion of an examining psychologist. In this case, the one reason cited by the ALJ does not constitute 'specific, legitimate reasons' supported by the evidence. Therefore, the ALJ erred in assigning little weight to Dr. Smith's opinion.") (citation omitted).

### 3. Drs. Gandler and Salter-Price

In light of the above errors, the Court need not address Allen's argument that the ALJ erred in discounting Drs. Gandler and Salter-Price's opinions that Allen is unable to engage in full-time work. *See Smolen*, 80 F.3d at 1285-88 (noting that the claimant "produced the opinions of four physicians" in support of her application, holding that the ALJ erred in rejecting two of those opinions, and declining to address the ALJ's rejection of the remaining two physicians' opinions).

## III. LAY WITNESS TESTIMONY

Allen argues that the ALJ erred by failing to provide germane reasons for discounting the lay witness testimony that Allen's husband, son, daughter, mother, and friend provided. In light of the errors described above, the Court declines to address this argument. *See McBride v. Colvin*, No. 13-cv-01311-PHX-SPL, 2014 WL 4053442, at *5 (D. Ariz. Aug. 14, 2014) ("The ALJ did not offer reasons that are specific, legitimate, and supported by the record, and therefore erred in rejecting Dr. Agarwal's opinion. Having reached this conclusion, the Court need not address Plaintiff's arguments concerning the ALJ's evaluation of Dr. Reynold[']s opinion or lay witness testimony.").

## IV.     REMEDY

"Generally when a court of appeals reverses an administrative determination, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citation omitted). However, in a number of Social Security cases, the Ninth Circuit has "stated or implied that it would be an abuse of discretion for a district court not to remand for an award of benefits" when three conditions are met. *Garrison*, 759 F.3d at 1020 (citations omitted). Specifically, the following "credit-as-true" criteria must be met before a court can remand for an award of benefits: (1) "the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion," (2) "if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand," and (3) "the record has been fully developed and further administrative proceedings would serve no useful purpose." *Id.* Even when these "credit-as-true" criteria are satisfied, courts in this circuit retain the "flexibility to remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id.*

The Court concludes that Allen satisfies all three conditions of the credit-as-true rule. First, as explained above, the ALJ failed to provide a legally sufficient reason to reject Allen's testimony and the opinions of two treating doctors. Second, if the improperly discredited evidence were credited as true, it is clear that the ALJ would be required to find Allen disabled on remand. Indeed, although the ALJ failed to develop the record regarding the bases for Drs. Arden and Kakodkar's opinions, Allen testified that, prior to the date last insured, she could not get down the stairs two or three times per week, that such days occurred on an unpredictable basis, that she would miss two or more day of work per month on an unpredictable basis, and

that she would need "to take breaks and rest at unpredictable times" at home. (Tr. 58-59.) The VE's testimony makes clear that, if Allen's testimony were credited as true, the ALJ would be required to find Allen disabled on remand. (*See* Tr. 65-66, confirming that the hypothetical worker could not sustain competitive employment if she was "absent from work two to three times per month on an ongoing basis and that typically extra breaks are not "allowed in competitive employment settings"). Finally, in light of the above analysis, the Court concludes that the record has been fully developed and further administrative proceedings would serve no useful purpose. *See Garrison*, 759 F.3d at 1021 ("Although the Commissioner argues that further proceedings would serve the 'useful purpose' of allowing the ALJ to revisit the . . . [claimant's] testimony that she rejected for legally insufficient reasons, our precedent and the objectives of the credit-as-true rule foreclose the argument that a remand for the purpose of allowing the ALJ to have a mulligan qualifies as a remand for a 'useful purpose' under the . . . credit-as-true analysis.").

Accordingly, the Court reverses the Commissioner's decision and remands for an award of benefits because the Court does not have any serious doubt as to whether Allen is, in fact, disabled. (*See also* Tr. 589-94, 597-98, indicating that four treating doctors, including two that began treating Allen before the date last insured, believed that Allen's conditions would prevent her from working and cause her to "miss [two] or more days from work per month on an unpredictable basis," and "take breaks and rest at unpredictable times during an average working day").

///

///

///

## CONCLUSION

For the reasons stated, the Court REVERSES the Commissioner's decision and remands for an award of benefits.

IT IS SO ORDERED.

DATED this 13th day of November, 2017.

_____
STACIE F. BECKERMAN
United States Magistrate Judge